**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | Case No. 06 CR 759 - 1 |
| ) | |
| CHARLOTTE SCHUETT ) | |

**CORRECTED
<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Charlotte Schuett pled guilty to a charge of mail fraud. In this decision, the Court considers a disputed Sentencing Guidelines issue.

Schuett's plea agreement set forth the following factual basis for her guilty plea:

Beginning no later than in or about March 2004 and continuing until at least in or about May 2005, defendant CHARLOTTE SCHUETT devised and intended to devise a scheme to defraud mortgage lenders by means of materially false and fraudulent pretenses, representations, and promises, and material omissions. Specifically, SCHUETT caused loan applications to be falsified in order to meet the requirements of mortgage lenders, including creating false sources of income such as rental properties and gifts, and falsifying the source of down payments. As a result, these mortgage lenders were fraudulently induced to fund approximately $3,227,350 in loans to SCHUETT and her investors.

It was part of the scheme that SCHUETT was associated with two companies called Wall Street Mortgage Acceptance Corporation ("WSM") and Blue Moon Properties ("Blue Moon"). SCHUETT, through WSM, advertised in local newspapers and on billboards a service that allegedly allowed home owners facing foreclosure to keep their residences. Through WSM, SCHUETT offered a sale-leaseback program that, in its essence, required the home owners to sell their properties. SCHUETT represented that the sale would be to an investor, who would not live in the house, but instead lease it back to the homeowner for a year to 18 months. During this time, the homeowner paid a monthly rent. At the end of the established time period, the investor would sell the house back to the homeowner at the same price as the investor originally paid. SCHUETT represented to the homeowner that the 12 to 18 month time

period was necessary to allow them to get back on their feet financially and establish better credit by making timely monthly rent payments.

SCHUETT caused loan applications in the name of investors to be falsified in order to meet the requirements of mortgage lenders, including creating false sources of income for the investors, such as rental properties and gifts. SCHUETT facilitated the closing of sales involving investors, by fraudulently making it appear that the investors were paying the down payments when, in fact, the down payments were funded from defendant SCHUETT's accounts at Amcore Bank, and no money was in fact paid from the investors.

For example, on or about May 26, 2005, defendant SCHUETT caused to be submitted as part of the closing documents for the sale of 2211 Cheshire Drive, Aurora, Illinois, a gift letter from investor Deborah W. that falsely inflated the amount of the gift to the investor from approximately $10,000 to $26,000, an Illinois Residential Lease Agreement listing a monthly rent to Deborah W. that was also false in that the property was not owned by Deborah W., and a Uniform Residential Loan Application that falsely listed a bank account and a rental property that were not owned by Deborah W.

On or about September 27, 2004, in the Northern District of Illinois, for the purpose of executing the above-described scheme to defraud, defendant SCHUETT knowingly caused to be deposited from Imperial Land Title a letter with attached closing documents for Loan #XXX-XXXX8743 to be sent an delivered by a private interstate carrier to Peoples Choice Home Loan, Attention: Closing Department, 7515 Irvine Center Drive, Irvine, California 92618.

Plea Agr. ¶ 6.

In the plea agreement, the parties agreed to disagree about the loss amount for purposes of the advisory Sentencing Guideline calculation. The government took the position that the loss amount should include "the approximately $777,755 worth of equity defendant obtained from approximately thirteen homeowners." *Id.* ¶ 9.b.ii. Schuett took the position that the "equity was not fraudulently obtained and should therefore not be included in the loss calculations." *Id.* Both parties reserved the right "to dispute at sentencing their positions regarding inclusion of the $777,755 in the loss

amount, as well as the fair market value of the properties." *Id.*

The Court held a two-day evidentiary hearing concerning the disputed loss amount issues and heard argument by counsel on a later date. At the hearing, the government called four homeowners who had dealt with Schuett, as well as the Federal Bureau of Investigation case agent, who testified regarding her interviews of other homeowners and summarized certain documents. The defense called an investigator with the Department of Housing and Urban Development and Schuett herself. Both sides also introduced numerous exhibits.

**Discussion**

The agreed-upon factual basis for Schuett's guilty plea concerned a fraud perpetrated on lending institutions. The factual basis included a reference to Schuett's dealings with homeowners but did not include any statement or admission that she had defrauded any homeowners. Rather, the plea agreement clearly reflected that was a disputed issue upon which there was no mutual understanding and no admission by Schuett.

The government contends that in addition to defrauding lenders, Schuett defrauded certain homeowners with whom she dealt. Schuett denies this. This dispute was the subject of the hearing.

Schuett had what might loosely be called a mortgage-rescue business. She advertised that she could help homeowners faced with foreclosure to keep their homes. As the plea agreement briefly referenced, Schuett used a sale-leaseback arrangement. The customer's home was sold to a third party (in some instances, Schuett herself), and the existing mortgage was paid off from the proceeds of the sale. The purchaser

3

leased the property back to the homeowner for a period of time, typically twelve months.  During that period, the homeowner would pay rent, and an effort would be made to repair her credit and obtain a new mortgage.  Once the homeowner obtained a new mortgage, she would repurchase the home.

That was the way things were supposed to work.  And, it appears, it worked out for a significant proportion of Schuett's customers.  Schuett testified – and the government submitted no contrary evidence – that approximately half of her fifty or so customers made their rent payments and were able to repurchase their homes.[1]  A number of homeowners, however, ended up losing their homes and much or all of the equity they had built up.  The government's proposed loss calculation is based on the experience of those homeowners.

Over the past year or so, it has become apparent that the home mortgage business has been plagued by lax and imprudent practices by some lenders and unscrupulous conduct vis-a-vis homeowners by other lenders.[2]  And there has been no shortage of stories regarding fast-buck artists who took advantage of financially troubled homeowners, swindling them out of the equity in their homes.  Because "[t]he great tides and currents which engulf the rest of men, do not turn aside in their course, and pass the judges by," Benjamin Cardozo, *The Nature of the Judicial Process* 168

---

[1] The government argues that Schuett offered no evidence to corroborate the contention that she had some satisfied customers, but the Court found her testimony in this respect credible, and the government offered no contradictory evidence.

[2] On the other side of the equation, some home owners and purchasers bought homes they could not possibly afford or agreed to terms that left them no way to handle the inevitable bumps in the road.

(1931), there is a temptation to leap to the conclusion that the homeowners in this case were the victims of deception or other misconduct. After all, they lost their homes and their equity; how could that have happened without some form of trickery? But the Court is required to resist the temptation to make that leap. Findings and conclusions reached via the judicial process must be based on evidence, reasonable inference, and dispassionate evaluation of both – not on current events, assumptions, or unsupported inferences.

From the evidence adduced at the hearing, it was somewhat difficult to get a handle on exactly how the government was contending Schuett had defrauded the homeowners. Several of the homeowners who testified claimed they did not realize they were selling their homes but rather thought they were just refinancing their loans; they did not realize they were going to be tenants leasing the homes; they did not understand they would be giving up their equity; their signatures had been forged on important documents; and they went into the transactions blindly because Schuett lied to them, hid things from them, and did a fast shuffle of paperwork.

The Court is sympathetic to the homeowners' plight and cannot imagine the distress they and their families experienced from facing foreclosure and, in some cases, losing their homes. But the testimony of the homeowners who contended they had been misled regarding the nature of the transaction Schuett proposed, that forgeries were made, and that they did not realize what they were doing lacked credibility. The first three of the four homeowners who testified described versions of the events that flatly contradicted, in significant ways, what they had told law enforcement. Their demeanor while testifying also contributed to the Court's determination that their

5

testimony at the hearing lacked credibility.

By way of example, Cynthia H[3] testified, quite adamantly, that she had no idea her house was going to be sold as part of Schuett's "save the home" plan and that she was first clued in to the fact that her home had been sold when a neighbor told her he or she had read about the sale in a local newspaper. This was not credible testimony. Ms. H had told the FBI, long before the hearing, that Schuett told her up front that she would sell Ms. H's house, use part of the equity to pay the arrearage, and Ms. H could then repurchase it a year later. Ms. H had also told the FBI she was aware during the interim period that she had a lease and was making rent payments, and she conceded on cross-examination that she knows that a person who has a lease and pays rent is not a homeowner.

The documentary evidence regarding Ms. H's transaction also confirms that the nature of the transaction was spelled out, relatively clearly in the Court's view, in the documents that Ms. H signed. She signed a real estate contract as a "seller," *see* GX H2, and a deed conveying the property to Schuett, GX H4, as well as a "residential real property disclosure report" whose stated purpose, set forth in capital letters just above her signature, was "to provide *prospective buyers* with information about material defects in the residential real property." *See* GX H2 (emphasis added). More pointedly, Ms. H signed a document entitled "Waiver and Acknowledgement [sic]" that, among other things, laid out the deal essentially as Ms. H had told the FBI she understood it.

---

[3] To protect the homeowners' privacy, the Court will use their first names and last initials and will identify exhibits – which in the government's numbering system used the homeowners' names plus a number – by only the first letter of the person's last name.

*See* GX H3.  The evidence also established that she had endorsed over to Schuett what any person quite plainly would have recognized to be a check for the sale proceeds.  This was consistent with the statement in the Waiver and Acknowledgment that "[i]n return for the value of remaining in its/their home and the agreement by Buyer to grant a month-to-month tenancy, Seller agrees to assign and transfer to Buyer at closing all proceeds of sale to Buyer acknowledging that said proceeds would be lost upon foreclosure."  *Id.*  Ms. H specifically initialed that provision when she reviewed the document.

It is conceivable that Ms. H may not have fully comprehended every term of the documents she signed.  But there is no question in the Court's mind that she understood the nature of the transaction; she admitted as much in her interview with law enforcement.  And even if she did not fully comprehend the documents' specifics, that does not mean Schuett defrauded her.  The government failed to offer credible evidence that Schuett made material false statements or promises, omitted or concealed anything significant, or did anything to hinder Ms. H's understanding of what she was doing.

Like Ms. H, Lorraine G claimed on direct examination that Schuett told her she was refinancing the house, did not disclose that the house would be sold, and said nothing about using Ms. G's equity in the home.  Ms. G stated that she attended a "closing" at which, she said, she was asked to sign a bunch of papers without reading them.  Despite admitting she signed a lease and understood she would be responsible for paying rent, she claimed she had no idea the house was being sold and she would no longer own it.  Ms. G identified her endorsement on a proceeds check for $62,000

7

but claimed that she did not recall signing it and that the signature purporting to be that of her husband was not actually his. She claimed she first found out the house actually had been sold only months later, when she went to a bank to try to get a new mortgage loan.

This testimony lacked credibility. Long before the hearing, Ms. G told law enforcement agents that she knew she was paying "rent"; she conceded on cross examination that she realized this meant she no longer owned the home. She also admitted that Schuett gave her a check for $10,000 or $11,000, to be used to pay the "rent" for six months. The documents regarding Ms. G's transaction, like those regarding Ms. H's transaction, reflected that she executed a lease. The lease contained a handwritten provision, which Ms. G had specifically initialed, stating, "Buy back amount for G____ will be payoff on loan at time refinance is taking place," making it clear that Ms. G would have to "buy back" the house to resume ownership. *See* GX G2. Finally, the Court's review of the transaction documents clearly demonstrated the error of her testimony that her husband's signature on the check had been forged, even if that testimony had been believable to begin with.

Luis B, a systems programmer, testified that he fell behind on his mortgage (the monthly payments were $3,400), refinanced it, and tried to refinance again but was unable to do so and also fell behind on other debts. He then went to see Schuett. Mr. B testified that Schuett told him she could help save his house, saying said she had a group of investors who "do this" so that people will not lose their homes. Mr. B claimed he did not know what Schuett meant by "do this" and did not ask. He initially testified that Schuett told him that the plan was to sell his house and lease it back to him, file for

bankruptcy to clear up his credit while he paid rent, and repurchase the home after a year. This was consistent with the documents Mr. B signed. Later in his testimony, however, Mr. B backtracked, claiming he had thought he was simply refinancing his home via Schuett, not selling it. That testimony was not credible. Indeed, Mr. B later conceded that Schuett had discussed the fact that he would be "repurchas[ing]" the home.

Mr. B claimed that Schuett said nothing about taking the equity out of the house and that she was "very clear" that he would be getting his equity back. The Waiver and Acknowledgment plainly stated, however, that "[i]n return for the value of remaining in its/their home and the agreement by Buyer to grant a month-to-month tenancy, Seller agrees to assign and transfer to Buyer at closing all proceeds of sale to Buyer acknowledging that said proceeds would be lost upon foreclosure." GX B9. Both Mr. B and his wife placed their initials alongside this particular provision when they executed the document, indicating they had reviewed it specifically.

When shown the sale proceeds check, GX B3, he acknowledged that it bore his endorsement but claimed on direct examination by the government that "I never saw it," did not know it was a check, and did not understand he was signing it over to Schuett. This testimony was not credible. Nor was Mr. B credible in his claim, on direct examination by the government, that he had not seen the HUD-1 form, GX B2, a document that he quite clearly signed.

Mr. B conceded he had told the FBI back in 2006 that Schuett told him he would be selling the house; he also conceded that he had told his bankruptcy trustee, under oath, that he did not own his home (he had filed for bankruptcy after the sale). He

9

denied telling the FBI that he did not think he owned the home after the Schuett deal, but that was not credible; it was later established that he had told the FBI exactly that.

Homeowner Leslie P testified that she and her family experienced financial reverses, and she fell behind on her mortgage payments. After unsuccessful attempts to refinance her mortgage loan, she met with Schuett. Ms. P's testimony regarding what Schuett told her, which the Court found largely credible, contrasted sharply with the testimony of the three other homeowners. Ms. P said that Schuett advised that a buyer would purchase the home and lease it back to Ms. P for a period of time. Schuett said she would set aside a particular sum to subsidize the payments in the interim period. Schuett would then assist Ms. P in obtaining a new mortgage loan so she could repurchase the home. Ms. P testified that she understood that after the old loan and arrearages were paid off, and the aforementioned amount was set aside, Schuett and the buyer would divide the remaining proceeds between themselves. Ms. P said she thought this was a rather high fee for Schuett to make but said she was willing to pay it to be able to stay in her home. Ms. P acknowledged her awareness that her home was being sold and agreed she had signed over the sale proceeds check to Schuett. She also acknowledged that she had the opportunity to read all of the documents she signed, including the Waiver and Acknowledgment and its provision stating that she was giving up her equity in the home.

Later, Ms. P testified, she got behind in her payments and spoke with an associate of Schuett named Deborah Walski. Walski denied that money had been set aside to subsidize Ms. P's payments. Ms. P thereafter hired an attorney who instituted litigation that is still ongoing.

The Court has reviewed the interview memoranda of other homeowners offered by the government in documentary form and via the testimony of Special Agent Jennifer French. These materials likewise do not support a contention that Schuett misled her customers to believe they were doing anything other than selling their homes and leasing them back or that they would not lose the equity. There is no basis to think testimony to that effect from those homeowners would have been any more credible than that of the homeowners who did so testify.

The government, perhaps because it realized there were credibility issues regarding some of the testimony it presented, did not contend in its argument following the hearing that Schuett had defrauded the homeowners regarding the nature of the sale-leaseback transaction,[4] deceived them via a fast shuffle of papers, or forged signatures or caused them to be forged. Rather, the government focused its claim of fraud on other points. It contended that Schuett lied to the homeowners about what would happen to the equity in their homes. It also contended she failed to disclose, or lied about, what she would be paid. The government also argued that the transactions were doomed to fail and thus were, in effect, inherently fraudulent.

The transaction documents – specifically the Waiver and Acknowledgment agreement – clearly stated that the homeowner was giving up her equity. This agreement, which each homeowner signed, stated that the homeowner "agrees to assign and transfer to Buyer at closing all proceeds of sale." *See, e.g.,* GX Schuett 7 ¶

---

[4] The government suggested that the testifying homeowners were simply confused about the nature of the transactions. That, however, is not what the evidence the government presented showed, as the Court has discussed.

11

3, GX Schuett 9 ¶ 2. The credible evidence showed that this provision was called to the homeowners' attention; among other things, homeowners typically were asked to initial this provision specifically. Thus the documentation itself did not mislead the homeowners about the potential loss of their equity. Indeed, in each instance, the homeowner endorsed the payout check to Schuett at or after the closing, and there was no credible evidence any homeowner failed to understand what she was doing in that regard.

That said, both the homeowners and Schuett testified that she told them part of the sale proceeds – i.e., part of the equity – would be set aside and used to help make payments over the period while the homeowner was renting the home from the buyer. Though the Court, as noted earlier, had credibility issues with some of the government's witnesses, this particular contention is confirmed via law enforcement interview memoranda and by Schuett herself.

The mere making of such side deals did not make the transactions fraudulent. Indeed, these side deals provided the only mechanism by which at least some of the transactions could work. Some of the homeowners were agreeing to pay rent that equaled or exceeded the mortgage payments that were already beyond their means. The understanding that part of the equity would be used to subsidize their rent was a key part of what gave Schuett's program the potential of working and thus was a significant part of what induced the homeowners to sign on.

Given those circumstances, there would be little question that Schuett was defrauding homeowners had she made the commitment to use part of their equity to subsidize their payments without intending to carry it out or even, perhaps, if she simply

12

did not follow through on her promise.  The government failed to prove by a preponderance of the evidence, however, that the commitment was made deceptively or that Schuett was responsible for a failure of performance.  The fact that Schuett's program worked as promised for some homeowners indicates that her commitment to subsidize the payments was not made without the intention to carry it out.  In addition, the government conceded during argument that some of the sale proceeds ended up going to make payment on the homes after the sale, which was consistent with what Schuett represented to the homeowners.

There was some evidence that Schuett's commitments to subsidize payments were not carried out as the homeowners claimed to have understood them.  The government, however, offered no evidence (other than the non-credible and uncorroborated testimony of certain homeowners) of the magnitude or significance of any such noncompliance.[5]  In any event, the government failed to provide evidence sufficient to prove by a preponderance that any noncompliance was attributable to Schuett.  During her testimony, Schuett appears to have laid the blame for any noncompliance at the feet of Walski, one of her sometime associates who, Schuett said, took over as manager of certain properties involved in her program.  The government provided no contrary evidence.  Under the circumstances, the Court cannot say that the government proved by a preponderance of the evidence that Schuett's undertaking to set aside part of the sale proceeds for the homeowners' benefit was

---

[5] It is conceivable that such evidence might have been buried in the mass of documents the government submitted, but if so, it was the government's job to bring it to the Court's attention (which it did not do), not the Court's job to ferret it out.

materially false or deceptive in its making or execution.

The government also contended that Schuett did not disclose her fee to the homeowners. There is no evidence to support a proposition that the homeowners believed, or rationally could have believed, that Schuett was working for free. Indeed, the one testifying homeowner whom the Court found largely credible, Leslie P, testified that Schuett disclosed she was getting a fee. Though Ms. P felt the fee Schuett had disclosed was rather high, she was willing to pay that price to stay in her home. It is more likely than not that the same was true of the other homeowners.

On the other hand, at least some of the homeowners likely were not aware of the full magnitude of what Schuett was making from the transactions. The government has not proven, however, that the relative magnitude of Schuett's fee was a material omission or false representation. As noted earlier, each homeowner acknowledged in writing that she was giving up the equity in her home, in return for being able to remain in the home as a tenant. *See, e.g.,* GX H3. That equity was the source of Schuett's fee. Because the homeowners acknowledged they were turning over *all* their equity to the home's buyer, it is difficult to see how the precise breakdown of who was getting it could be material.[6] Nor was any testimony to that effect credible.

---

[6] The Court rejects the government's contention that it proved the statement in the Waiver and Acknowledgment that the equity was going to the "buyer" was a material misrepresentation because the equity actually went to Schuett. As best as one can tell from the somewhat muddled evidence, Schuett and the buyers split up the equity by separate agreement. In any event, each homeowner knowingly signed over to Schuett the proceeds check from the sale of the home. The Court also rejects the government's contention that Schuett's take had to be disclosed on the HUD-1 closing statement. The HUD-1 disclosed the amount of cash going to the seller, and it did so accurately. The seller (homeowner) thereafter signed over the proceeds check to
(continued...)

14

That said, if the amount Schuett kept for herself adversely impacted the mutually understood goal of keeping the homeowner in her home so that she could later try to refinance and repurchase it, then its magnitude could have been material, at least in some instances.  Specifically, if Schuett's fee were so high that it left insufficient equity to permit the agreed-upon subsidization of payments, it would have been a significant factor whose deceptive nondisclosure would be material and thus fraudulent. But the government's evidence regarding what Schuett herself netted was, charitably speaking, murky.  As noted earlier, the government conceded that some money in fact was used to subsidize the homeowner's payments.  It did not offer any sort of accounting of what money went where.  The Court is left unable to say what, if any, shortfalls particular homeowners experienced in the payment subsidization.  The burden of this uncertainty falls on the government, given its obligation to prove its contentions by a preponderance of the evidence.

The Court turns last to the government's suggestion that Schuett's program was inherently fraudulent.  Again, the government failed to prove this by a preponderance of the evidence.  As the Court has noted, based on the evidence presented, the program worked for a significant proportion of Schuett's customers.  That does not mean, of course, that the particular homeowners who are the focus of the government's proposed loss calculation were not defrauded in this regard.  But it does support, to some degree, Schuett's contention that her program was not inherently doomed to fail.

---

[6](...continued)
Schuett.  That eventuality was fully disclosed to the homeowner in the Waiver and Acknowledgment agreement.

Given the agreed-upon undertaking that part of the equity would go to subsidize payments, the program was workable. Whether it worked or not depended upon the reliability of that undertaking. As the Court has indicated, the government did not meet its burden of proving that Schuett made a fraudulent commitment in that regard or that she was responsible for failing to carry it out.

The fact that certain homeowners suffered losses, though unfortunate, does not necessarily mean they were victims of a fraud, let alone a fraud perpetrated by Schuett. Nearly all of these homeowners were facing foreclosure when they went to see Schuett. By that time, it appeared, they had no other options – many had already attempted work-outs with their lenders and/or had been unsuccessful in refinancing. Although these homeowners lost their homes after working with Schuett, the odds are overwhelming that they would have lost them if they had never met her. And although they lost equity in their homes, the Court cannot say – as there is no evidence – that this would have turned out differently if they never had met Schuett (they all faced foreclosure imminently or virtually so).

The government suggested during its cross-examination of Schuett that the homeowners would have been better off had they simply sold their homes and moved out – and it implicitly was critical of Schuett for not telling the homeowners just that. Under that scenario, the government suggested, the homeowners likely would have at least ended up with money in their pockets – the difference between the hypothetical sale price and the amount due on the mortgage including late fees and other sale-related costs. This hypothesis looks good on paper, but that is as far as it goes, at least based on the evidence presented to the Court. Specifically, the government offered no

16

evidence that this alternative would have worked for any of the particular homeowners in this case; it assumes the existence of a buyer willing to pay enough for the homeowner to make money on the sale, and no such evidence was presented, not even inferentially or circumstantially. The other problem with the government's hypothesis is that the homeowners who went to see Schuett did not want to sell and move out; they wanted to stay in their homes and, as at least one of them testified, would have done virtually anything to accomplish that.

In sum, though the Court cannot rule out the possibility that some homeowners were defrauded in one or more respects, the question is one of proof, not possibility. The government failed to prove such fraud by a preponderance of the evidence. The Court therefore rejects the government's contention that the amounts the testifying and non-testifying homeowners lost should be included in the loss amount for Sentencing Guidelines purposes.

This is the Court's conclusion whether the issue is assessed as part of the offense of conviction (as the government argues) or as relevant conduct (as Schuett contends). The Court tends to agree with Schuett that this is an issue of relevant conduct. Though the government is correct that Schuett pled guilty to a charge that included an allegation that she defrauded homeowners, that was not part of the factual basis for her guilty plea. And as noted earlier, the plea agreement clearly contemplated that the claim of a fraud on the homeowners was disputed. If it was understood to be disputed, it was not admitted.

The resolution of this point does not, however, affect the outcome of the case. During argument following the hearing, the government conceded that it was required to

17

prove by a preponderance of the evidence that Schuett had defrauded homeowners. As the Court has made clear, the government failed to meet its burden.

**Conclusion**

For the reasons stated above, the Court rejects the government's contention that losses experienced by certain homeowners should be included in the loss amount for Sentencing Guidelines purposes. Because the government has failed to prove the homeowners were victims of fraud by the defendant, the vulnerable-victim enhancement likewise does not apply, nor will the Court deny Schuett credit for acceptance of responsibility based on her contention that she did not defraud the homeowners. The Court sets a sentencing date of November 24, 2008 at 2:30 p.m. and directs counsel and the defendant to appear at that date and time.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: November 2, 2008
(corrected January 21, 2009)